### THE MASSASSAGUA.

(District Court, E. D. New York. June 25, 1903.)

1. COLLISION—STEAM AND SAILING VESSELS CROSSING.
    A steam vessel passing down East river with tows in the evening *held* in fault for a collision with a sloop which was crossing the river, without changing her course, and whose lights could have readily been seen by proper attention. The sloop also *held* in fault because the master, although warned by his lookout that the steamer was coming directly toward them, gave her no attention, although he might readily have avoided the collision by changing his course after he saw the negligent navigation of the other vessel.

In Admiralty. Suit for collision.

Owen & Sturges, for libelant.
Carpenter, Park & Symmers, for claimant.

THOMAS, District Judge. On December 3, 1903, shortly after 5 o'clock, the steam canal boat Massassagua, with two barges in tow on a hawser, collided with the oyster sloop Pell, which was crossing the East river on the port tack; the wind being about west or west north west. The wind was light, and the sloop was carrying mainsail, jib, and topsail, and side lights. Upon coming out of Buttermilk

Channel, she laid her course diagonally across the river, and maintained it to the time of the collision. The tide was at the end of the ebb, but it was running slightly flood along the New York docks. The master of the sloop was at the helm, and his son, apparently about 18 years of age, was forward acting as lookout, accompanied by a boy whose presence then and evidence in court are unimportant. The son called the master's attention to the canal boat, and the latter then saw her side lights a quarter of a mile away. The sloop at the time was on a course from Governor's Island to Fulton Market, where she intended to make a landing. Later the son called out that the canal boat was heading for the sloop; but the master did not look, and kept on his course. Later the son called again, and the master looked and saw the canal boat's bow a few feet away, and the collision almost immediately occurred; the canal boat striking the sloop just aft of amidships on the starboard side. Previous to the collision, the canal boat gave several toots of her whistle; but the master of the sloop paid no attention, upon the plea that he thought it could not have been intended for the sloop. The collision took place on the New York side of the center of the river. About 100 feet on the starboard hand of the canal boat was a tow going up the river, and it was the purpose of the master of the sloop to cross ahead of the canal boat and the up-going tow, and, if he could not cross the bow of the latter, to go around under her stern. The master of the sloop, although warned by his son, did not look at the canal boat from the time that he saw her, a quarter of a mile away, until she was 10 feet away. The evidence of the master of the sloop that he did not change his course from Governor's Island is sustained by the evidence of his son, and of the pilot of the tug boat and tow going up the river, who, however, places the accident very near to the New York shore.

The evidence on the part of the canal boat is that she was coming straight down the river, and that she saw a sloop in the neighborhood of Governor's Island headed directly upstream, and that she came forward until she was about 200 feet away, when she swung to port; that the canal boat tooted a whistle, whereupon the sloop, when 75 or 100 feet away, swung directly across the bow of the canal boat. The evidence of every person connected with the canal boat and the two boats in tow was to this general effect: That none of such witnesses saw the lights of the sloop, save one witness on one of the boats in tow, who testified that he saw her red light until it shut in as the sloop crossed the canal boat's bow. It is claimed that it was light enough to see the vessel herself; but it is most singular that the sloop's lights were not seen, and it is evident that the pilot of the canal boat did not use the lights for the purpose of determining on what course the sloop was sailing. The destination of the sloop would take her obliquely across the river. The wind was fair for such direction, and the evidence shows that such was her general direction; and the failure of the canal boat to see the lights and be governed thereby indicates that there was lack of attention.

But what shall be said of the master of the sloop, who paid not the slightest attention to his lookout's warnings, and who held his

course, unprepared for the emergency which arose. His action is incomprehensible. He would not be forewarned, and when the collision was at hand he was unprepared to act. The wind was such that he could have avoided the tow when he saw the continuance of her negligent progress toward him. If it were certain that the canal boat was trying to crowd the sloop out of the way, the case might be different. But the probabilities are that the pilot on the canal boat relied upon the loom of the sloop and was misled thereby. The master of the sloop testified that, when the canal boat was first reported, he looked under the beam and saw her, and that he did not look at her again until his son reported the third time, and said, "She is coming into us," and that the vessels were then 10 feet apart. The following illustrates his view of his duty:

"Q. You hadn't seen her during that time? A. I didn't want to see her. Q. If you had seen the boat coming toward you in a way that involved risk of collision, couldn't you have done something to avoid that collision? A. Oh! I could have went out of the river, I suppose. Q. You could have headed so as to avoid collision? A. I could went the other way; but I wasn't going that way. I was going to Fulton Market. * * * The first time when he first spoke to me, then I looked; but the second time I didn't pay any attention. I says: 'You don't want to monkey under a steamer's bow. Let him know where you are going, and they will keep clear.' Q. Did he report her the third time? A. Yes, sir; when she got close to us he said, 'She is coming right into us.' Then I said: 'I can't help myself. If he wants to hit us he will have to hit us, because I can't get out of his way.' Q. How far from you was he then? A. I don't suppose over 10 feet. * * * Q. It is your idea that it is not your duty to keep watch of a steam vessel approaching you after you have warning that that vessel is coming down upon you? A. I did have to look forward. He was watching her all the time. Q. But he reported, and you didn't pay attention to it? A. The second time I did not because I put all confidence in the world in the man going clear. I looked and see how he was coming, and thought, 'He will come close to us and sheer off.' Q. You proceeded on the theory that every man would do his duty? A. Yes, sir."

The direct question is raised whether it was the duty of the master of the sloop, after repeated warnings from his son, from which he must have known that the canal boat had changed her course, or at least was coming toward him, to be attentive to her, or whether he could hold his own vessel on her course and be blind to the threatened collision? The view of the master of the sloop is not approved. It is quite evident that he was in a position to avoid the injury that befell him, had he been less obstinate in adhering blindly to his primary right of way.

The damages and costs will be divided.